IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

- - - - - - - - - - - - - - - - x
                           :
UNITED STATES OF AMERICA     :
                           :
   v.                   :   Criminal No. 19-00224-DKC
                           :
MICHAEL NANA BAAKO,      :
                           :
       Defendant.     :
                           :
- - - - - - - - - - - - - - - - x   May 10, 2019

Baltimore, Maryland

**DETENTION HEARING**

BEFORE:   THE HONORABLE STEPHANIE A. GALLAGHER, Judge

APPEARANCES:           DANIEL ALAN LOVELAND, JR. Esq.
                        ZACHARY A. MYERS, Esq.
                        United States Attorney's Office
                        36 S. Charles St., 4th Floor
                        Baltimore, MD 21201
                          On Behalf of the Government

                        RICHARD A. FINCI, Esq.
                        Houlon Berman Finci Levenstein
                        and Sandler, LLC
                        7850 Walker Dr., Suite 160
                        Greenbelt, MD 20770
                          On Behalf of the Defendant

                        LAURA KELSEY RHODES, Esq.
                        Laura Kelsey Rhodes LLC
                        200 A Monroe, Suite 305
                        Rockville, MD 20850
                          On Behalf of the Defendant

Also Present:          Danielle Sanger, Pretrial Services

Proceeding recorded by electronic sound recording, transcript produced by transcription service.

Audio Operator:          Jill Klein

Transcription Company:   CompuScribe
                         P.O. Box 789
                         Cheltenham, Maryland 20623-9998
                         (301) 577-5882

I N D E X

                                                          Page

Preliminary Matters                                        4

Comments from Danielle Sanger
  On Behalf of Pretrial Services                           7

Comments by Daniel Alan Loveland Jr., Esq.
  On Behalf of the Government                             11

Comments by Richard A. Finci, Esq.
  On Behalf of the Defendant                              19

Rebuttal by Daniel Alan Loveland Jr., Esq.               27

Ruling by Judge Stephanie A. Gallagher                   28

KEYNOTE: "---" denotes inaudible in the transcript.

P R O C E E D I N G S

(Whereupon, at 11:52 a.m., the proceeding began.)

MR. FINCI:  -- yesterday in order to represent Mr. Baako.  And as you probably also know, this morning the Government filed a motion for detention --

THE COURT:  Correct.

MR. FINCI:  -- with some documents that have been seized apparently during the execution of a search warrant in this case.  And while I was well-prepared to move forward with respect to what was originally at issue, I thought, with respect to residency and ties to the community, as you can see, we haven't had time to address the issues that the Government has raised, number one.

And number two, I feel as though given the opportunity, we would be able to provide pretrial with some additional information in a manner and in a way that we don't have to be concerned about affecting the underlying case either.

THE COURT:  Okay.

MR. FINCI:  So I think with time, we might be able to really resolve a lot of this if not all of it.  So I am wondering if the Court has availability.  We could at least start working on this and pass to the afternoon, or would the Court need to push this to early next week in order that we could address and file a response or deal with the

Government's assertions.

THE COURT:  Why don't we do this?  Let me enter for now an -- well, actually, why don't we pass it until this afternoon to keep your client here because if I enter an order of detention by agreement at this point, the marshals may take him back.

So let's set a time this afternoon to continue.  If it turns out that everyone is not able to accomplish all the verification and other investigation they need to do by this afternoon when we set it, we will then set a time for next week and see where we are then.  Why don't we handle it that way?

And I agree with you that on the current record with pretrial services, it was going to be very difficult for me to consider release conditions without having verification performed of some important elements.

MR. FINCI:  Those seem to be problems we can overcome.  We still have to deal with the Government's motion and allegation.

THE COURT:  Exactly but on the pretrial front, for starters, that was going to be an impediment no matter what.  And I guess we should put on the record because I don't think we formally called the case that we are dealing with: Michael Nana Baako, DKC19-0224.

MR. LOVELAND:  And for the record, Your Honor, Dan

Loveland and Zac Myers on behalf of the United States.  And we are able to set in a detention hearing for later today and we contacted Mr. Finci and sent him a motion within minutes of filing it with the Court but we understand he entered his appearance yesterday.

THE COURT:  Right.  What is the schedule for this afternoon?

THE CLERK:  We have a detention hearing at 2:00 p.m.

THE COURT:  Why don't we put this in at 3:00 p.m. and again if we are unable to go forward at 3:00 p.m., we will set it for another time next week.  Does that make sense to everyone?

MR. LOVELAND:  That works for the United States, Your Honor.

THE COURT:  Okay.  We will reconvene at 3:00 p.m.

THE CLERK:  All rise.  This honorable Court now stands in recess.

(Whereupon, the case was set aside at 11:55 a.m. to reconvene at 3:00 p.m.)

THE CLERK:  the Honorable Stephanie A. Gallagher presiding.

THE COURT:  Good afternoon.  Please be seated. Mr. Loveland?

MR. LOVELAND:  Good afternoon, Your Honor.  We are here in the case of the United States versus Michael Baako,

Case Number DKC19-0224.

Dan Loveland on behalf of the United States.  I am joined by my co-counsel Zac Myers from the U.S. Attorney's Office.

THE COURT:  All right, thank you.  Good afternoon.  Mr. Finci?

MR. FINCI:  Yes, and good afternoon, Your Honor.  Richard Finci on behalf of Mr. Baako.  Also working with me on this case is Laura Rhodes.

THE COURT:  All right.  And I see that Ms. Rhodes is entering her appearance --

MS. RHODES:  For today only.

THE COURT:  Just for today for the detention hearing.  Okay, all right.  Thank you, and good afternoon, Mr. Baako.  All right, I know we were here this morning.  Pretrial was going to get some additional information from the Defendant, and then we were going to hear argument.  So why don't we  start by letting pretrial -- I know they have not done a written report but let pretrial provide an oral report about the new information.

MS. SANGER:  And Your Honor, all this information is just a supplement for the report I already prepared.

THE COURT:  Yes.

MS. SANGER:  So I was able to speak with the Defendant again with his counsel present.  And he continued to

decline to answer any questions about place of birth or citizenship.  But did advise that his earliest memory up until 1996 was in Ghana prior to coming to the United States on a B-1/B-2 visa.

And then after that, he did advise that he traveled to Ghana in 2008, 2009, 2013 for a church conference, and then he traveled to Jerusalem in 2014, 2015, 2016 and 2017.  Also for church conferences.

He traveled to Bangkok in 2015 for a church conference and traveled to Malaysia in 2017 for a church conference.  He did also advise that he lived in Maryland since 1996.  So he does have ties to the community.  In addition to that, the Defendant advised that he also possesses, not currently in his possession, but issued to him, expired Ghanaian and US passports.  And that those are currently in the custody of the case agent.

He noted that his mom, dad and one sister are all deceased.  And prior to his current employment, he advised that he was moonlighting at St. Agnes Hospital and had three years of residency also at St. Agnes Hospital in Baltimore, Maryland.

He added some additional information about his finances as well.  He added information about his Biazo Health Care, which is his business.  It is worth about $10,000 give or take some estimates.  That he also has student college loan

account with approximately $45,000 in it.

THE COURT:  So that is a loan?

MS. SANGER:  So it is a loan account so it is from a loan but is actual money that he has.

THE COURT:  I see, okay.

MS. SANGER:  Is my understanding.  And that he also has the hard assets that are mentioned in the United States' motion for detention.  So the gold and such things he has advised that he does have possession of those hard assets or did have possessions of those hard assets as well.

He  advised that he owned a 1/2 acre to 1 acre of land in Ghana.  He advised that it would be worth about $500,000 in United States dollars if he sold it all right now outright.

So with all this additional information, we were also able to speak with the potential third-party custodian Mr. Isaac Ano*.  He did originally immigrate to the United States as Isaac Erko*.  He advised that he is a United States citizen.  He is naturalized as of 2001.

He resides at 71428 Fox Harbor Way in Elkridge, Maryland 21075.  And he lives and resides with his wife and his four children.  He would be willing to have Mr. Baako, the Defendant, reside with him, and serve as a third-party custodian.

There is no record for him, no criminal history.  No

issues in that aspect and neither for his wife.  He was able to verify the majority of the Defendant's information that the Defendant provided to me.  The only thing he was not able to verify was any of his financial information.

But he did verify his employment and where he works.  He advised that as far as he knows the Defendant is a United States citizen as well.

With all that information, Your Honor, at this point in time our biggest concern is risk of nonappearance.  So due to the circumstances of the alleged offense, the Defendant's possession of two passports, his frequent foreign travel, ownership of foreign land, unknown place of birth and citizenship, and unverified -- I mean, it is verified but nonconcrete information about where he is from, any additional stuff like that, we are recommending that the Defendant be detained.

THE COURT:  Thank you.  All right, I will let Mr. Loveland -- oh, did you have a question about the pretrial report?

MR. FINCI:  A little bit.  I just wanted to clarify couple of things for the Court so the Court has full picture and a complete picture.

With respect to the business, I think the statement was that the business was worth $10,000.  I believe what the information is, is that there is approximately $10,000 in the

lcj                                                                          11

bank account of the business.

THE COURT:  Okay.

MR. FINCI:  The business might be worth more than that.  So I just wanted to clarify that point.

THE COURT:  Okay.

MR. FINCI:  Second point, with respect to the Ghanaian property, there is a partially constructed home on that property as well.  It is not just land.

THE COURT:  Okay.

MR. FINCI:  And that is the basis of the valuation. I can't tell you the percentage.  I think it is under roof, I am pretty positive, but I don't believe it has water or electricity running through it at this point.  And so that is -- so you have that picture of what that property is, Your Honor.

THE COURT:  Okay.  All right, thank you.  All right, Mr. Loveland, I am happy to hear your argument as to detention.  I have reviewed the memo that you submitted.

MR. LOVELAND:  Thank you, Your Honor.  And the Government's position remains that the only proper way to ensure Mr. Baako's appearance at trial and for all proceedings to come for this case, is that he be detained pretrial.  And that is due to the fact that there is a serious risk of his flight.

I just wanted to touch on two main themes.  The

lcj                                                                    12

first is the nature and circumstances of his offense conduct, and I want to touch on that through the timeline in this case.

And the second thing is the new evidence that was recovered during the search warrant that was executed on the day of Mr. Baako's arrest this past Wednesday, and how that evidence both adds to the already overwhelming evidence in this case but also how that evidence demonstrates that he is a continued risk of flight.

And some of that evidence was just talked about by Ms. Sanger in terms of his assets.  The hard assets that I believe Ms. Sanger was referring to were the approximately $18,000 worth of gold and silver that the Government learned about by finding a receipt in a briefcase in Mr. Baako's home.

But so in terms of the timeline and the nature of the circumstances of this case, another thing that was found in Mr. Baako's home on Wednesday was a marriage certificate from Ghana.  That marriage certificate was between Michael Nana Baako and Rachel Ado Ashon.  And that marriage certificate was from October 28, 1995.

It was just over a month later that both Mr. Baako and Rachel Ado Ashon both applied for their B-1/B-2 visas as Ghanaian nationals that would allow them to come to the United States.  That was December 5, 1995.  The applied on the exact same day.

That visa was granted.  The United States has

lcj                                                                    13

Michael Baako's passport from that time.  We also have that visa.  And that was actually included as a picture in the motion that was submitted this morning.

Michael Baako never left the United States.  He applied to certify his Ghanaian medical education.  Those applications include numerous pictures of him.  They also include his statements that he was born in Ghana.  They included the same birthday.

And just briefly: The birthday in the indictment that shows up, there are Xs representing the month and the day but it is the same birthday on every piece of paper that we have examined in this case.  It is always May 8, 1969, except for in the mistake that we filed this morning in the brief.  It says 1968.  But the birthday is always consistent, as is Michael Nana Baako's name.

March 11, 1998, Michael Baako marries again.  This time to a United States citizen.  20 day later, Michael Baako and that United States citizen petition for Michael Baako to become a U.S. citizen through his relationship in that marriage.

Ultimately U.S. officials decided that was sham marriage after they evaluated the evidence in that case and conducted interviews of both Mr. Baako and the U.S. citizen.  They also did a written questionnaire.  Answers were consistent about things like how many locks are there on the

lcj                                                                    14

door?  What does the bedspread look like?

That determination was in 2000 after Michael Baako gave a sworn statement to immigration officials saying partial truth that he was born in Ghana and that he was U.S. citizen.

So that was the first time in this case that we have record of him meeting with U.S. officials.

But the attempted fraud wasn't deterred. Interestingly, in April 2002, Michael Baako and Rachel Ado Ashon applied for a passport for their first child together, Minor Child 1, who now may be 18 but I will continue to refer to him as Minor Child 1.

On that form, Baako tells the truth.  He says he is not a U.S. citizen and he was born in Ghana.  But his child was nonetheless entitled to a U.S. passport because they were born in America.

In 2004, March 2004, Michael Baako and Rachel Ado Ashon apply for the diversity visa in Ghana.  They apply but what happens is in July of 2005, the interview was scheduled for Ghana and no one showed up.  So U.S. officials have an NA file from that as well.

In November of 2005, Michael Baako registered to vote in Maryland at the MVA.  And he did vote in his first election in November 2006.  That conduct is not charged here but it is part of a story.

In April 2007, Michael Baako submits his second

passport application for Minor Child 1.  This time he is a U.S. citizen.  And he was born in Hillsboro, North Carolina.

And then in April 2008, Michael Baako submits a passport application for himself, saying that he is a U.S. citizen born in Hillsboro, North Carolina.  And he attaches an affidavit to that application from someone who says that they were at his baptism in North Carolina and knew that Michael Baako was born in North Carolina despite there being no record of that.

In September of 2009, Michael Baako and Rachel Ado Ashon submitted a passport application for their second minor child.  Again Michael Baako claims to be a U.S. citizen. Again he claims to be born in North Carolina.

In April 2010, sensing these discrepancies, officials from the Department of State interview Michael Baako.  He tells them that he is a U.S. citizen born in North Carolina.  And again he is not deterred after this meeting.

In July 2012, Michael Baako and Rachel Ado Ashon submit yet another passport application, this one a renewal for Minor Child 1.  In that application, Michael Baako again says he is a U.S. citizen.  He says he is born in North Carolina.

Finally in February 2018, Michael Baako submitted a passport renewal application for himself and again he represented that he was born in North Carolina.  He said he

was a U.S. citizen or a non-citizen national.

Again he is interviewed in June of 2018 by officials, this time in Washington, DC.  He claims that he was born in North Carolina.  He moved to Ghana when he was 1 years old.  He claimed to have never applied for citizenship benefits.

And I think the interesting point there is that 5 months later on November 2018, he voted.  So the pattern that we see in this case is that despite numerous meetings with U.S. officials, despite numerous indications that his fraud might be detected, he continued to commit fraud.

In terms of new evidence in this case, Mr. Baako is now disclosing he does in fact own gold and silver.  We also found the Ghanaian passport from 2006 that we hadn't had before.  That is in the motion.

Another troubling piece here that is worth touching on is there are various custodial agreements that we found that were purported to be bonds that would be sold by Dr. Michael N. Baako, with the buyer's information left out.

One was a $1,000, 1943 allied victory bond that was purportedly issued by the Republic of China at 6 percent interest rate with 39 coupons.  There were two others, one that was 1930 Chinese $90 million CGU Central Bank of China Shanghai custom gold unit bonds, or purported to be.

THE COURT:  Do we know what those are or maybe that

the paperwork is unclear?

MR. LOVELAND:  The reason we quoted it is because we have that paperwork and that is what they purport to be, and so that I what I would submit to the Court for now.

I don't know, honestly, Your Honor, which would be more troubling for detention purposes: whether it is a real asset or whether it is not.  But the Government submits that either way, it supports our argument for detention.

The other thing we found was an April 2007 letter from the State of North Carolina to Michael Baako saying that they had no record of his birth there.

We found the same affidavit that he had used to apply for a U.S. passport from the person who claimed to have been present at his baptism in North Carolina.  And we found a purported baptismal certificate from a North Carolina church.

And then finally, we already mentioned this, we found the marriage certificate between Rachel Ado Ashon and Michael Nana Baako from Ghana: October 28, 1995.

I also want to touch on the flight patterns in this case.  We don't have a full flight record.  Based only on his U.S. passport, since 2008, we know he has flown internationally at least 9 times, as recently as July 2017 when he returned.  We are not able to tell exactly where the connecting flights took him at that, but Kuala Lumpur was the last place that he flew out to in June 2017.

lcj                                                          18

And I also want to address in terms of the 3142(g) factors, sort of the elephant in the room. When I walked into our first scheduled hearing this morning, it felt a little bit like I was late to church. And so I understand that there are people here today who might be able to speak to Michael Baako's presence in the community.

That doesn't discount the overwhelming evidence in this case. We have his birth certificate from Ghana. We have matching photographs from dueling passports that claim the same person with the same birthdate with the same name having been born in two separate countries.

It doesn't discount the serious risk of flight here. Assets weren't disclosed until the Government disclosed them in a motion this morning. There is nearly $18,000 worth of gold and silver. We don't know where that it is at this point but that exists, and it wasn't disclosed until after the motion was filed.

And again, the evidence in this case is overwhelming and the evidence in this case lends itself to a serious risk of flight. The nature of these crimes are that Mr. Baako does not remain where he is lawfully able to remain, and he does not follow the laws that apply to him, even after he is confronted by U.S. officials with discrepancies. His lies continue. Thank you, Your Honor.

THE COURT: Thank you. Mr. Finci? Oh, sorry.

Pretrial?

MS. SANGER:  I just wanted to correct, and I know Mr. Finci is going to mention it as well.  I did leave out the information about the Chinese bonds.

THE COURT:  Yes.

MS. SANGER:  So the Defendant did advise that he had an investment account that was mentioned by the AUSA.  He doesn't actually know how much it was worth but he did invest $7,250 in it, so he did advise me of that as well.

I am not great with finances and I don't know the specifics of what that looks like.

THE COURT:  That is in these bonds, Chinese bonds? And that was disclosed today at the interview?

MS. SANGER:  Yes, Your Honor.  I apologize.  I did miss that part.

THE COURT: Did you want to say something about that, Mr. Loveland?

MR. LOVELAND:  Just that it was disclosed today and not on Wednesday or after Wednesday.

THE COURT:  Okay.

MR. FINCI:  Your Honor, I know -- let me just address that first.

THE COURT:  Sure.

MR. FINCI:  You know in the previous representation and what had been going on, learning more about the case

without disclosures, there was a little bit of reluctance to be able to answer all the questions, and warnings given by counsel, and with time able to review and evaluate the information, it is provided more fully.

And I know that we have discussed that at length in the meetings today how we were able to learn more about the case, review the indictment, review the motion that the Government filed, and thereby are able to provide more information for pretrial to consider.

I am disappointed with the ultimate recommendation made here but I will start addressing that now.

THE COURT:  Sure.

MR. FINCI:  So at the outset, Your Honor, I want to give you an overview of our position.  This client has such a substantial amount, number of people and ties to this community that to say he is a risk of -- overcomes the argument of risk of flight.

Everything that Government has alleged are efforts to stay in this country, not evidence of fleeing.  And so that is sort of our overarching theme.  What you have heard about are allegations of criminal conduct that the Government says happened, fraudulent conduct, and is at the heart of the indictment.

You haven't heard preparations to flee.  You haven't heard, I am aware I under investigation.  I am going to get

lcj                                                                    21

out of here.  You haven't heard anything like that.  What you have heard are allegations about the underlying indictment and him wanting to stay here with his family.

So what I would like to do: I know that the community ties have been briefly described to Your Honor in the past.  I have a witness that could put more or I could proffer to the Court these community ties that I would like the Court to know about because I think they are extremely important in deciding whether he is a real risk of flight or whether it is some paranoid fantasy that he is going to flee the United States because of this indictment.

THE COURT:  I am happy to hear the information by way of proffer unless Mr. Loveland would prefer that a witness be called to testify.

MR. LOVELAND:  No objection, Your Honor.

MR. FINCI:  Thank you.  So I was prepared, Your Honor, to call Isaac Ano, who is here.  And he is the person who was going to be or that we are proposing to be a third-party custodian.

So he was going to talk to you about everything that he knows about my client.  He has known him 17 years.  He knows that all the people in this courtroom are members of his church.  In addition to being a medical doctor, as I guess I would describe him, avocation, he is a pastor of this non-denominational church.

They have a location in Laurel.  He is their spiritual leader and I believe everyone in this courtroom would testify to his character and to his importance in their lives.

Isaac would say that he frequently visits with my client and his family at their home in Fulton, Maryland.  That he knows Rachel Ado Ashon well.  That he knows my client's two children: Tiffany, who is in 12th grade at Reservoir High School.  Your Honor, I was going to introduce Tiffany's high school transcript that shows a very high grade point average.  She is an excellent student, preparing to go to college and by all accounts a wonderful young lady.

I was going to -- Isaac would tell your about Zachary, who is my client's son in middle school.  He attends Lime Kiln Middle School.  He doesn't get quite as good grades but he works hard.  He has some special needs, as the Court knows, and my client is very much involved in his care and treatment and transportation to deal with those special needs.

Isaac would tell you that whenever he needs something from my client, that he is very generous with his time and with his advice, and that he would happily serve as third-party custodian under whatever conditions the Court would deem appropriate in this case to, I will emphasize, reasonably assure his appearance.

When the Government began its argument, the

Government wants to point out, wants to argue that no conditions will assure his appearance.  I think that the standard is that his appearance needs to be reasonably assured, and we are suggesting that there are conditions, in addition to third-party custody, that would reasonably assure our client's appearance in Court given his significant community ties.

We would suggest that GPS monitoring at his home where he has resided -- if I haven't mentioned, it is in the report -- he has resided since approximately 2004 at the Fullton address, Your Honor.  That I have a copy of the deed for that property as well as a deed of trust for that property.  This has been the family home for that long a period of time.

THE COURT:  I understand the property is essentially underwater, at least from what was proffered to pretrial.

MR. FINCI:  If you look at the tax assessment and you look at the amount of the mortgage -- I can't tell you how up to date the tax assessment is.  I don't believe that it is -- I don't know.  I can't tell you.  I am believing that it is probably worth more than the tax assessment.  They are usually under-assessed by some amount.

So I believe there is value in it but regardless, that is where they would live and he has lived there for a very long time.  He is also willing to surrender to the

registry of the Court the gold and silver coins that are mentioned in the report as additional collateral to assure his appearance. And I think that is a further condition of release that would reasonably assure his appearance, Your Honor.

All the people in this courtroom, many of them have volunteered for him to stay with but -- everybody is nodding their head. They all very much support him. And the allegations in this case are very unusual. I am sure the Court has seen very few cases like this where you are dealing with a person who is a professional in the community, he is a licensed medical professional who has many patients that he has treated, that he has cared for over a long period of time.

And yet the allegations are that there is this long pattern of lying in regard to his citizenship capacity, and I understand that. I absolutely need time to get to the bottom of what that is all about. But to say that suggests that he is a risk of flight from abandoning all of that I think is extreme.

I will represent further, Your Honor, with respect to the property in Ghana. It is my understanding that property is intended to be a second home and is intended to be a retirement place for my client at some point in the future. It is not preparation to flee the United States.

And even if it were, it is a fixed location in a

lcj                                                                    25

country where I understand, perhaps the Government will correct me if I am wrong, there is extradition available to the Government if you were at that property and had fled the United States.

So I am saying that this situation -- you have a peaceful man who has done everything he could to stay in the country, and yet it is being argued to you that what he -- the Government fears that he is going to flee the country.  And I just say that it is kind quite a contradiction.

My client is the breadwinner for his family, Your Honor, and the bottom line is that they need him as well.  And so for him to flee under those circumstances again it would be an abandonment of everything that is important to him, and I just don't believe that is reasonably going to happen.

That the conditions we are suggesting will reasonably assure his appearance in Court.  We are asking that Isaac be, Isaac Ano be his custodian.  That he can live wherever the Court prefers, either at the Fulton property, where Isaac Ano is willing to move in there with his wife to be the custodian or at Isaac Ano's home.

I don't have that address handy at the moment but I think it has been provided to pretrial.  So it is in the possession of pretrial.  May I just for a moment consult with my co-counsel, Your Honor?

THE COURT:  Yes.

(Pause)

MR. FINCI:  So a couple of points my co-counsel wanted me to make in closing, Your Honor.  More of a factual point is that his daughter has high school graduation May 23. He wanted you to know that but I wanted you to know that the preparation of a defense in this case is going to require my client's assistance.

He is significantly impaired in addressing the Government's allegations by being detained pending trial in this case.  The nature of these allegations, even if they are strong, that doesn't go to his likelihood of appearance at trial, and we need his assistance to investigate what is alleged in this indictment and what is argued by my client as he has demonstrated through his actions about his citizenship status.

That is going to require defense investigation and his assistance to attempt to square up.

So his defense is significantly impaired, and I would suggest that the presumption of innocence despite the Government's argument as to the strength of its evidence is another factor that the Court should consider in that our client is needed to investigate this case.

So I think that covers everything that I have to say or I would produce through my argument and through Isaac Ano's testimony, Your Honor.

lcj                                                                          27

THE COURT: Okay. All right, thank you. Mr. Loveland?

MR. LOVELAND: Just briefly, Your Honor. The governing standard here is preponderance of the evidence. We point you to the Stewart case we cited on page 4 of our motion. In terms of the detention preparation issue, that is at issue in every case. We are obviously not here to prove beyond a reasonable doubt but I feel it is represented in the motion and it is represented in the speaking indictment.

The evidence here is overwhelming. And that is a factor for this Court's consideration under 3142(g). I would also like to point the Court to a case, and I don't have the firsthand knowledge that my co-counsel does because he prosecuted this case, but the United States versus Amos case was in this court. The number is CCB18-224.

I understand Mr. Amos was a nurse, and the indictment was for passport fraud. Three U.S. citizen kids. One of those children actually had special needs. A lot of the same arguments that were present here.

The Court in that case decided to release Amos on ankle monitoring, electronic monitoring, and Amos did cut his ankle bracelet and fled. And so I just want to point that out.

I understand the arguments in terms of Mr. Baako's -- the nature of his offense is sort of suggesting

that he was trying to stay in America.  And there is some truth to that but I think the overarching theme in this all is a willingness to lie in order to receive immigration benefits.

And a lack of willingness to abide by laws that permit entry or require certain hurdles to be taken in order for people to legally be present and to legally enjoy citizenship and immigration benefits.  And so I do think that the evidence is overwhelming here, and that the Defendant is a serious risk of flight.

Notwithstanding what I accept are probably strong ties to the community through his church.  Thank you, Your Honor.

THE COURT:  All right, thank you.

MS. SANGER:  Your Honor, just for the record, I know I mentioned that Mr. Ano did advise he is a U.S. citizen.  We have not received confirmation from the Department of Homeland Security advising whether or not that is accurate.  I just wanted to inform the Court of that.

THE COURT:  All right, thank you.

(Pause)

THE COURT:  All right.  I have carefully considered the arguments made by both parties, and let me explain where I am now what my reasoning is.

I am cognizant of Mr. Finci's arguments regarding, first of all, the community support, which is readily evident

by the number of people here today and the fact that accepting the truth of the allegations as alleged by the Government, evidence is he has a desire to stay in this country.

The problem I am having with all of that is primarily two things.  One is the lack of candor with pretrial services about the assets, and setting aside the Ghanaian property for moment, the gold and silver and bonds and other items, you know, he did disclose some assets to pretrial.  He did not disclose those assets to pretrial.  And that is troubling me.

But what is really troubling to me is the possession of the Ghanaian property, and I am not able to reconcile how I can get around that to a position where I am comfortable that conditions will keep Mr. Baako in the country and appearing in court.

The fact that he has a residential property in Ghana that was not disclosed originally to pretrial services is something that is of great concern to me.

So for the time being I am issuing an order of detention.  But I am willing to reconsider that if we can find a way to address specifically the Ghanaian property and to provide the Court with some additional security regarding the Defendant's financial security, specifically regarding the ability to ensure his appearance here.

The family home I do not have enough information

about whether there is equity in it or whether there is any significant value to it or not based on what is here today, and certainly there hasn't been anything else other than the gold and silver and bonds offered to provide additional security.

But even if we could get past the issue of sufficient security, that property in Ghana is really quite troubling to the Court in terms of assessing likelihood of nonappearance.  And so for those reasons, again I am issuing an order of detention today.  I am willing to reconsider if there is additional information that is developed or some way of dealing and providing some assurance with that property.

It is not the kind of situation where someone could just put a lien on it or issue a deed because it is in another country, and that is problematic.  But the value of the property and the existence of the property in another country is something that I am not able to get past at this point given the nature and circumstances of the offense.

Is there anything else we can address in this matter today?

MR. LOVELAND:  Yes, Your Honor.  We spoke with defense counsel briefly.  If it is at Your Honor's convenience, we would be willing to move to arraignment at this time as well.

MR. FINCI:  Yes, that makes sense to us as well,

lcj                                                                      31

Your Honor.

THE COURT:  All right.  Have you reviewed the indictment with your client, Mr. Finci?

MR. FINCI:  Yes, I have, Your Honor.

THE COURT:  You waive the formal reading.

MR. FINCI:  Yes, Your Honor.

THE COURT:  All right.  Mr. Baako, please respond to the questions the Clerk will ask you.

THE CLERK:  Mr. Baako, please state your full name for the record.

THE DEFENDANT:  Michael Nana Baako.

THE CLERK:  What is your age?

THE DEFENDANT:  50.

THE CLERK:  What year, just the year, were you born?

THE DEFENDANT:  1969.

THE CLERK:  Have you read or reviewed a copy of the indictment by the U.S. attorney or have the substance of the charges been explained to you?

THE DEFENDANT:  Yes, Your Honor.

THE CLERK:  Do you understand them?

THE DEFENDANT:  Yes, I do.

THE CLERK:  Mr. Finci, are you satisfied the Defendant understands the charges against him?

MR. FINCI:  I am, Madam Clerk.

THE CLERK:  Mr. Baako, you have been charged in

lcj                                                                    32

Counts 1 through 4, 5, and 6 through 8, of the indictment.

How do you plead?

THE DEFENDANT:  Not guilty.

THE CLERK:  Thank you.  The plea is not guilty.

THE COURT:  All right, Mr. Finci.  Do you reserve a jury trial?

MR. FINCI:  Yes, Your Honor.

THE COURT:  And Mr. Loveland, I know we are early but where do we stand with discovery and dates?

MR. LOVELAND:  Your Honor, we don't have any dates in this case yet.  We will send Mr. Finci a discovery agreement and look to forward discovery next week.

THE COURT:  All right.  And I will just ask counsel to contact Judge Chasanow to get dates in this case.

MR. LOVELAND:  We will.  Thank you, Your Honor.

MR. FINCI:  Your Honor, may I make an indulgence before you leave the bench?

THE COURT:  Sure, yes.

MR. FINCI:  Your Honor, would the Court consider -- I don't know whether the Court makes such recommendations, I don't know -- that my client be detained at CTF in DC so that we can have better access to him than we would have at CDF, being both counsel from the southern --

THE COURT:  Down in the southern portion of the state.

lcj                                                                          33

MR. FINCI:  It is really difficult to get appointments and times, whereas CTF in DC, where I know the Court sometimes has detainees.

THE COURT:  Why don't we do this? The best place to start because the Court doesn't usually dictate to the marshals where someone goes.  Why don't you start by asking the marshals whether that is a possibility and let me know if they are unable to accommodate that and we will see.  I don't know, Mr. Loveland, if you --

MR. LOVELAND:  I just wanted to say that there is no objection from the Government in terms of where he is housed.

THE COURT:  Sure, and I don't see any reason why there would necessarily be an objection unless the marshals have some sort of issue in terms of numbers or bed space or anything like that.

So why don't you start by requesting that of the marshals, and then if you run into an issue, let me know.

MR. FINCI:  I see, Your Honor.  Maybe a recommendation that goes along from the Court would help us move that and I will take care of that.  If there is nothing there, it is just another lawyer asking --

THE COURT:  We just don't really have a structure for making that sort of recommendation typically because it is not typically in our normal course but again why don't you ask them and if it winds up being problematic, call my chambers

lcj                                                                      34

and let me know and I can try to figure out how to inquire and get that done.

          But I think typically in those kinds of situations, they are responsive to requests from counsel.  Anything further?

          MR. LOVELAND:  Nothing further from the Government, Your Honor.

          MR. FINCI:  Thank you.

          THE CLERK:  All rise.

     (Whereupon, at 3:42 p.m., the hearing concluded.)

35

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the

duplicated electronic sound recording of the proceedings in

the above-entitled matter.

*Laura C. Jackson*  06-13-19
_____
Laura C. Jackson                    Date
Transcriber